**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES FULMER**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:08cv1630 |
| | ) | Electronic Filing |
| **COMMONWEALTH OF** | ) | |
| **PENNSYLVANIA, PENNSYLVANIA** | ) | |
| **STATE POLICE, JEFFREY B.** | ) | |
| **MILLER, FRANK MONACO** and | ) | |
| **HARVEY COLE, JR.,** | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Plaintiff James Fulmer ("Fulmer") commenced this civil rights action pursuant to 42 U.S.C. § 1983 seeking redress for workplace retaliation in violation of the First Amendment and Title VII.  Fulmer avers that defendants, the Pennsylvania State Police ("PSP"), Jeffery B. Miller ("Miller"), Frank Monaco ("Monaco"), and Harvey Cole, Jr. ("Cole") violated his constitutional and statutory rights in retaliation for responses he gave in state police internal investigations and proceedings.  The court dismissed plaintiff's § 1983 claims against the PSP and the individuals for actions taken in their official capacity.  It also dismissed plaintiff's Title VII claim.  What remains is plaintiff's First Amendment claims against the individual defendants in their individual capacity.  Presently before the court is defendants' motion for summary judgment.  For the reasons set forth below, the motion will be granted.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

1

material fact and that the movant is entitled to judgment as a matter of law.  Summary judgment

may be granted against a party who fails to adduce facts sufficient to establish the existence of

any element essential to that party's claim, and upon which that party will bear the burden of

proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial

burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact.  When the movant does not bear the burden of proof on the claim, the movant's initial

burden may be met by demonstrating the lack of record evidence to support the opponent's

claim.  National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).

Once that burden has been met, the non-moving party must set forth specific facts showing that

there is a *genuine issue for trial*, or the factual record will be taken as presented by the moving

party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in

Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return

a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the opponent must do more than simply show that there is

some metaphysical doubt as to the material facts.  Matsushita, 475 U.S. at 586.  The non-moving

party must present affirmative evidence in order to defeat a properly supported motion and

cannot simply reassert factually unsupported allegations.  Williams v. Borough of West Chester,

891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent merely rely upon conclusory allegations

in [its] pleadings or in memoranda and briefs.  Harter v. GAF Corp., 967 F.2d 846 (3d Cir.

1992).  Likewise, mere conjecture or speculation by the party resisting summary judgment will

not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d

360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence merely is colorable or lacks

sufficient probative force summary judgment must be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to turn a blind eye to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. Fulmer's employment with the PSP began on September 19, 1983. In 2002, he advanced to the position of lieutenant and was stationed at Troop A in Greensburg. On March 27, 2004, he was assigned the position of Crime Section Commander. The position's duties included receiving and investigating complaints of criminal conduct in Somerset, Westmorland, Indiana and Cambria counties and overseeing and directing all criminal investigations undertaken by Troop A. Additionally, plaintiff had the responsibility of handling the investigations of complaints from the public alleging misconduct by state police officers in those counties.

While stationed at Troop A plaintiff was under the command or interacted with several officers whose conduct is at the heart of plaintiff's First Amendment claims. They include: Cole, who was acting captain of the PSP; Monaco, who was a major in the PSP, the officer in charge of the Greensburg barracks, and plaintiff's commanding officer; and Sergeant George Emigh ("Emigh"), a subordinate officer.

After becoming Crime Section Commander, plaintiff began to experience problems with Emigh. After encountering a number of difficulties with Emigh, plaintiff began to document Emigh's questionable behavior. Plaintiff reported this behavior to Monaco and Cole as part of a document outlining numerous issues within plaintiff's crime section. The matters pertaining to Emigh included improperly performing investigations, interfering with the hiring process,

3

maintaining an unauthorized vice operations account, and failing to notify command of an arrest. Monaco sided with Emigh, referring to him as "an outstanding individual" and "the best Crime Sergeant in the state." Monaco never addressed the reported issues and thereafter rarely spoke to plaintiff.

On June 8, 2006, Fulmer responded to a complaint by District Magistrate Judge Suzanne Steffee ("Steffee") alleging that she had been sexually harassed by Emigh. Steffee relayed that she had been experiencing ongoing problems with Emigh. She was prompted to speak out about his behavior when, at a "wings" party sponsored by the Indiana station held at a Red Barn restaurant on a Saturday night, Emigh attempted to French kiss her and inappropriately grabbed her buttocks.

Plaintiff immediately commenced a formal complaint process against Emigh, as required by PSP regulations. The PSP has a "zero tolerance" policy when dealing with complaints of sexual harassment or misconduct. Plaintiff reduced his interview with Steffee to a six-page report which he attached to a "Use of Force or Complaint" form and submitted to Lieutenant Dale Blasko ("Blasko").

Thereafter, Blasko informed plaintiff that Monaco did not agree with plaintiff's summarization of the Steffee complaint. That day Monaco commented to plaintiff that he believed the statute of limitations had run on the offense and that Steffee "probably enjoyed the kiss." Pl. Concise Statement of Facts (Doc. No. 44) at No. 15, 16. Monaco then said to plaintiff; "you understand, I am the major and if I say something is a certain way, that's the way it is." Pl. Concise Statement of Facts, No. 17, 29. Plaintiff believed that Monaco's comment suggested that no further action should be taken on the Steffee complaint.

In response to plaintiff's formal initiation of the Steffee complaint, Emigh initiated a "Use

4

of Force or Complaint" against plaintiff.  This complaint alleged that plaintiff was biased against him and had assisted others in contriving the sexual misconduct complaint.

Because the Steffee complaint involved a possible violation of the PSP's sexual harassment policy, it was reviewed by State Police Equal Employment Opportunity officer Lieutenant Martin Henry ("Henry").  Henry's investigation characterized Monaco's statement, "I am the major and if I say something is a certain way, that's the way it is..." as an instruction that plaintiff not further process the Steffee complaint.  Internal proceedings were then instituted against Monaco.

The State Police Internal Affairs Department began investigations into the complaints involving plaintiff and various officers.  In addition to the Steffee complaint, Emigh's counter-complaint, and the investigation into Monaco's comments, an investigation was initiated into an unrelated complaint stemming from a physical altercation in the Greensburg barracks between civilians and PSP members.  The civilians filed an internal complaint.  During the investigation of the civilian complaint plaintiff accused Cole of placing the investigation on hold, and Cole thereafter became upset with plaintiff's accusation.

Lt. Donald Carahan ("Carahan") conducted the investigation into Monaco's comments.  Plaintiff relayed the comments Monaco made regarding the Steffee complaint.  Carahan showed Monaco plaintiff's interview responses and censorious information in plaintiff's journal notes.  The notes were critical of Monaco and illustrated plaintiff's opinion regarding the effect that Monaco and Emigh were having on the barracks.  Defendants' Response to Plaintiff's Concise Statements (Doc. 49) at ¶ 32.  The journal stated:  "The Devil is running wild in Troop A.  Everything comes back to the Major and George EMIGH.  What does EMIGH have on the Major."  Defendant's Exhibit (Doc. No. 41-4) at 29.  Monaco became enraged and harshly

criticized plaintiff, calling him "incompetent", a "rat weasel", "gutless", a "clueless idiot", a "bare-faced liar", a "disgrace", and stating that he would "like to go down and smack his lying face." Pl. Concise Statement of Facts, No. 23. He also accused plaintiff of having a "vendetta" and attempting to document "the couple times he's smarter than I am." Pl. Concise Statement of Facts, No. 32; see also (Doc. 41-5) at p. 11.

Cole was interviewed pursuant to the Emigh complaint. He indicated plaintiff never provided anything substantial against Emigh. He ultimately determined that there was a personal conflict between the two, stemming from a homicide investigation in which Emigh told Cole that plaintiff was out to get him. Cole thought the conflict should be investigated.

On March 7, 2007, Cole discharged Emigh based on the Steffee incident. Emigh grieved the termination. Monaco wrote to the State Police Disciplinary Officer, requesting consideration of mitigating circumstances in Emigh's punishment. The Department Disciplinary Officer found the discharge to be an appropriate penalty. The Commissioner reviewed the decision and re-instated Emigh subject to a 35 day suspension, finding the punishment to be too harsh. The Pennsylvania Office of Inspector General then initiated an investigation into Monaco's backing of Emigh.

On March 26, 2007, plaintiff was removed from his position as Crime Section Commander. Cole admitted to plaintiff that the removal was due to the comments plaintiff made about him and Monaco and specifically mentioned the comments plaintiff made about Monaco in conjunction with the Steffee complaint. In addition to his removal plaintiff also received a negative employee performance review, which referenced the comments plaintiff made about Emigh, Monaco, and Cole in the course of the investigations. The comments included plaintiff's statement that Cole had placed the investigation into the civilians' complaint "on hold." Cole

6

told him that his work performance had nothing to do with the poor review.

Plaintiff filed a grievance regarding his removal and poor performance review. The grievance was resolved by a settlement with the PSP whereby the performance review would be deleted and replaced with a new one. His removal was deemed not to be a violation of the labor contract. Subsequently, Cole replaced the negative review with two reviews ranking plaintiff's performance the highest in every possible category. Plaintiff retired on August 28, 2008. On that day plaintiff gave a farewell address that was critical of Cole and Monaco's command, accused Monaco of criminal conduct, and left the barracks in a hot air balloon.

Defendants contend they are entitled to summary judgment because plaintiff has not engaged in protected First Amendment speech. They assert plaintiff was not at any time speaking as a public citizen under the teachings of Garcetti v. Ceballos, 547 U.S. 410 (2006), and plaintiff's speech did not address a matter of public concern in any event.

Plaintiff contends his First Amendment retaliation claim is predicated on disclosure of government impropriety, a matter of the utmost importance to public review of government operations. Furthermore, if defendants' actions are permitted to stand, that would in effect sanction efforts by high ranking police officers aimed at silencing a subordinate employee and thwarting investigations into complaints against a fellow officer and impropriety undertaken in conjunction with a citizen-initiated investigation. See Swineford v. Snyder County Pa., 15 F.3d 1258, 1274 (3d Cir. 1994) ("Speech involving government impropriety occupies the highest rung of First Amendment Protection."). In addition, speech that is critical of the internal handling of a claim involving sexual harassment perpetrated on a member of the public by a public servant constitutes a matter of public concern. See Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997).

Plaintiff next argues that his interests in making the speech outweigh any employer interests in promoting workforce efficiency and harmony under Pickering v. Board of Education, 391 U.S. 563 (1968). Specifically, plaintiff asserts that his speech made in interviews involving the investigation into his handling of a sexual misconduct complaint and a superior officer's comments about whether further undertakings should be conducted in conjunction with that complaint override any claimed need to maintain efficiency, discipline or morale. Thus, plaintiff asserts that his speech involved matters of public concern.

Finally, plaintiff notes that Cole explicitly told him that the reason he received a demotion and the negative performance review was his speech during the internal investigation interviews. Furthermore, after it was determined that the review was to be replaced, plaintiff received the highest marks in all possible categories. Additionally, Monaco purportedly had a personal grudge against plaintiff after he revealed the information surrounding Monaco's reaction to the Steffe complaint and thereafter Monaco became involved in the demotion of plaintiff. Consequently, plaintiff maintains that material issues of fact exist as to causation and he is entitled to present his retaliation claim to a jury.

A three-part test is utilized to assess a public employee's First Amendment claim of retaliation. See San Filippo v. Rutgers, et al, 30 F.3d 424, 430-31 (3d Cir. 1994). First, the employee must demonstrate that the activity in question is protected. Reilly v. City of Atlantic City, 532 F.3d 216, 224 (3d Cir. 2008); accord Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993). Second, the employee must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action. Green v. Philadelphia Housing Auth., 105 F.3d 882, 885 (3d Cir.1997); Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993) (citing Czurlanis v Albanese, 721 F.2d 98, 103 (3d Cir. 1983) (citing Mt. Healthy City School

District Board of Education v. Doyle, 429 U.S. 274 (1977))).  The alleged retaliation cannot be trivial or *de minimis* and must be "sufficient to deter a person of ordinary firmness from exercising his or her First Amendment rights."  McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006).  After this initial burden is met, the employer still can justify the adverse action by showing that it would have reached the same decision even in the absence of the protected conduct.  Green, 105 F.3d at 885.  Defendants bear the burden of proving this defense by a preponderance of the evidence.  Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 416 (1979) (citing Mt. Healthy, 429 U.S. at 287).

In general, the inquiry into whether speech is entitled to First Amendment protection requires an assessment of whether it involved a citizen's right to speak about matters of public concern.  Pickering v. Board of Education, 391 U.S. 563, 568 (1968).  Prior to the articulation of the "official duties" doctrine in Garcetti, this inquiry only involved a determination of whether the speech involved a matter of public concern and, if so, the balancing of (1) the employee's interest in speaking about such matters and (2) an employer's interest in promoting the "efficiency and integrity in the discharge of official duties, and [in maintaining] proper discipline in the public service."  Curinga v. City of Clairton, 357 F.3d 305, 311(3d Cir. 2004) (quoting Connick v. Myers, 461 U.S. 138, 150-51 (1983)).  Garcetti now requires a threshold determination of whether the employee spoke as a citizen, as opposed to speaking as a public employee within the realm of his or her employment duties.  Garcetti, 547 U.S. at 419;  Foraker v. Chaffinch, 501 F.3d 231, 243 (3d Cir. 2007) (citing Sigsworth v. City of Aurora, 487 F.3d 506, 509-10 (7th Cir. 2007)).  In other words, "Garcetti simply 'narrowed the Court's jurisprudence in the area of employee speech' by further restricting the speech activity that is

protected." Reilly, 532 F.3d at 228 (quoting Foraker, 501 F.3d at 241).  Thus, following

Garcetti,

> [a] public employee's statement is protected activity when (1) in making it, the
> employee spoke as a citizen, (2) the statement involved a matter of public
> concern, and (3) the government employer did not have "an adequate justification
> for treating the employee differently from any other member of the general
> public" as a result of the statement he made [i.e., the Pickering balancing test].

Id. (quoting Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006) (quoting Garcetti,

547 U.S. at 418) (same)).

These three inquiries into whether the speech is protected by the First Amendment are

threshold questions to be considered by the court as a matter of law.   Hill v. Borough of

Kutztown, 455 F.3d 225, 241 (3d Cir. 2006); Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir.

2009);  see also Knight v. Drye, 375 Fed. Appx. 280, 282  (3d Cir. 2010); McGreevy v. Stroup,

413 F.3d 359, 364 (3d. Cir. 2005) (holding that the second and third inquiries are questions of

law); Baranowski v. Waters, 2008 WL 4000406 (W.D. Pa., August 25, 2008), aff'd,  Baranowski

v. Waters, 370 Fed. App. 318 (3d Cir. 2010) (holding that the first inquiry is best decided by the

court in the first instance).  The first of these inquiries is to be made "after an examination of 'the

content, form, and context of [the] statement, as revealed by the whole record.'" Hill, 455 F.3d

at 243 (quoting Rankin v. McPherson, 483 U.S. 378 (1987)); accord Foraker, 501 F.3d at 239.

In contrast, the causation element and whether the defendant has met its burden to prove the

adverse action would have been taken in any event are questions of fact to be resolved by the

jury.  Baldassare v. New Jersey, 250 F.2d 188, 195 (3d. Cir. 2001).

In Garcetti, the Court had "no occasion to articulate a comprehensive framework for

defining the scope of an employee's duties in cases where there is room for serious debate. . ."

and thus opined that "[t]he proper inquiry [to be employed was] a practical one."  Garcetti, 547

U.S. at 424; Foraker, 501 F.3d at 239 (same). In undertaking this inquiry, formal job descriptions and the fact that the statements were made in or about the workplace are not controlling. Garcetti, 547 U.S. at 420, 424-25; Foraker, 501 F.3d at 242.

Against this backdrop, "the critical question is whether [Fulmer's] speech was made pursuant to his duties as a police officer." Baranowski, 370 Fed. Appx. at 319. And if it was, whether the speech nevertheless has a sufficient private citizen analog to permit it to survive the "official duties" bar erected by Garcetti. Compare Garcetti, 547 U.S. 423-24 ("When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government citizens.") with Reilly, 532 F.3d at 216 (holding that although a police officer's testimony was given pursuant to his official duties, it sufficiently was clothed with the attributes of citizen speech to receive First Amendment protection) and Whitfield v. Chartiers Valley School Dist., 707 F. Supp.2d 561, 577-78 (W.D. Pa. 2010) (Cercone, J.) (testimony by assistant superintendent given at school board disciplinary hearing as part of her official duties had sufficient analogue to citizen speech to be clothed with First Amendment protection).

Plaintiff attempts to avoid the application of Garcetti by distinguishing his speech as being given in response to a personal attack by a fellow officer as compared to Ceballos' speech, which reflected the official policy of the employer. See Whitfield, 707 F. Supp.2d at 577 ("Ceballos' memo was the quintessential of speech commissioned by the employer: it reflected nothing more than the employer's own speech and it was speech that the employer had an unfettered right to control."). But the personal aspects of plaintiff's speech and the fact that it was given in response to a complaint initiated against him do not excuse his obligation to satisfy the threshold inquiry mandated by Garcetti.

11

The developed record demonstrates that plaintiff only spoke pursuant to his official duties. In all instances his statements, comments and written observations were given and divulged within the formal process involving PSP internal affairs. In each instance plaintiff was interviewed or gave information in conjunction with or response to a formal complaint that had been initiated with the PSP Internal Affairs Department. As such, the context in which the speech was given supports the view that it was given in his capacity as an employee and pursuant to his official duties. The other aspects and attributes of the speech likewise support this assessment.

First, plaintiff's speech relating to the Steffee sexual misconduct investigation, Emigh's subsequent counter-complaint, the investigation into Monaco's comments, and the citizen complaint all emanated from his duties as Crime Section Commander or from knowledge he gained from performing his duties in conjunction therewith. Statements provided within a workplace process about matters involving the employer's operations or information gained by an employee from performing the job are indicative of speech given pursuant to one's official duties. See Foraker, 501 F.3d at 240 (police officers' internal affairs investigation testimony and subsequent testimony regarding the same to the Pennsylvania Auditor General reflected specialized knowledge gained from the declarants' performance of their work duties and thus constituted speech given in the capacity of their "official duties" which did not enjoy First Amendment protection) (citing Williams v. Dallas Independent School District, 480 F.3d 689 (5th Cir. 2007) (*per curiam*) (applying Garcetti to foreclose a retaliation claim by high school athletic director who was discharged after writing a memo to his principal concerning the handling of school athletic funds because the statements were gained from the director's daily operations, reflected specialized knowledge about the operations of the workplace and were

12

provided in an effort to address matters pertaining to the employer's workplace operations) and

Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006), cert. denied, 549 U.S. 1323 (2007) (female

corrections officer's reports documenting sexual harassment by prisoners and inaction on the part

of her superiors reflected speech given pursuant to her "official duties.").

Second, the duties governing plaintiff's knowledge of or actions concerning any matter

involving workplace conduct by a fellow officer likewise support the proposition that the speech

at issue was given pursuant to plaintiff's official duties.  In general, members of the PSP have a

duty  to "promptly report to their supervisors any information which comes to their attention and

which tends to indicate that any other member or employee has violated any law, rule,

regulation, or order."  Defendant's Ex. 33 (Doc. No. 49-1) at 32-33.  Additionally, when

answering questions in internal investigations members are "required to truthfully and

completely answer all questions."  Id. at 33.   Before answering questions plaintiff was provided

with and signed a copy of the PSP's policy requiring his truthful and complete answers and in

doing so he acknowledged that if he failed to answer truthfully and completely he could be

"subjected to administrative action."  Defendant's Ex. 27 (Doc. No. 41-8) at 2-4.

Although responding to an internal investigation is not part of plaintiff's daily duties, it

does not follow that responsibility to respond was not part of plaintiff's official duties. See Vose

v. Kliment, 506 F.3d 565, 570 (7th Cir. 2007) (A public employee's more general

responsibilities are not beyond the scope of official duties for First Amendment purposes.).  To

the contrary, such employer policies provide additional support for the notion that statements

given pursuant to such policies in proceedings involving workplace conduct fall within an

employee's official duties.  See Skrutski v. Marut, 288 Fed. Appx. 803, 807 (3d Cir. 2008)

(supervising police officer's reprimands of subordinate, reports of questionable conduct by

13

fellow officers, and responsibility for preparing report of investigation into criminal conduct by one fellow officer, all of which were made within his direct chain-of-command, fell short of providing statements that could serve as the predicate for a viable First Amendment retaliation claim.); Foraker, 501 F.3d at 231 (dispositive inquiry was whether plaintiffs "were expected, pursuant to their job duties, to report problems concerning the operations at the range up the change of command."); Callahan v. Fermon, 526 F.3d 1040, 1045 (7th Cir. 2008) (lieutenant's speech was not protected when made pursuant to state police rules of conduct requiring all officers to report misconduct of fellow officers.).

Third, the fact that plaintiff voiced his concerns only in the context of the internal investigations and not in a public setting further demonstrates that First Amendment protection is not available. He spoke and provided written statements only as part of internal proceedings designed to address incidents in the workplace or behavior having implications on fellow officers' professionalism. Statements advanced in such a setting and aimed at assisting in the regulation of fellow officer behavior have their genesis in an officer's official duties and fail to support a First Amendment retaliation claim. See Skrutski, 288 Fed. Appx. at 807 (speech made by police supervisor "within the direct chain-of-command" not protected by the First Amendment); Spiegla v. Hull, 481 F.3d 961, 967 (7th Cir. 2007) (speech not protected where corrections officer reporting possible security lapse to assistant superintendent "did not make a public statement, discuss politics with a coworker, write a letter to newspapers or legislators, or otherwise speak as a citizen"); Lyons v. Mentzer, 2008 WL 4444272, *4 (E.D. Pa., October 2, 2008) (police officer following internal procedures to report fellow officer's failures to perform duties did not engage in citizen speech).

Fourth, plaintiff's speech was made to superiors who are charged with the duty of

investigating internal complaints and regulating employee conduct. It was disseminated to those whose job it was to gather such information and pass it up the chain-of-command. As such, the speech was given in a setting designed to uncover the truth about the conduct of fellow officers and provide appropriate official response or discipline. Speech given to such individuals in such a setting is not designed to disseminate the information to the public. Compare Kline v. Valentic, 283 Fed. Appx. 913, 916-17 (3d Cir. 2008) (state police corporal who "complained up the chain of command" about "maliciously skewered" investigation and had personal stake due to implications about his professional reputation did not speak "in any public forum" and failed to clear the official duties barrier erected by Garcetti ) with Charles v. Grief, 522 F.3d 508, 514 (5th Cir. 2008) ("Most significantly, though, Charles's speech-unlike that of the plaintiffs in Garcetti and Williams [v. Dallas Independent School Dist., 480 F.3d 689 (5th Cir. 2007)] - was not made in the course of performing or fulfilling his job responsibilities, was not even indirectly related to his job, and was not made to higher-ups in his organization (as were Ceballos's and Williams's) but was communicated directly to elected representatives of the people.").

Finally, plaintiff's speech lacks a private citizen analogue. See Garcetti, 547 U.S. 424 ("When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees."). While certain journal entries made by plaintiff could be viewed as involving matters of public concern, they were only brought to light in the course of the investigation, and no facts have been established by plaintiff that suggest they were either intended to be used in a public setting or that plaintiff attempted to or did use them in such a setting. Consequently, a "practical inquiry" based on the fully developed record leads only to the conclusion that plaintiff's speech was provided as part of his official duties and his First Amendment retaliation claim is barred by Garcetti.

Plaintiff's brief in opposition extensively addresses the issues of whether certain aspects of his speech could be perceived as involving matters of public concern and involve interests that outweigh any governmental interests advanced by defendants. His brief is full of citations to pre-Garcetti authority marshaled in support of the same. Nevertheless, because plaintiff has failed to submit evidence to support a finding that he was speaking as a public citizen, there is no occasion to engage in the traditional Pickering balancing analysis. See Foraker, 501 F.3d 243 ("Because we agree with the District Court that Price and Warren were acting pursuant to their job duties when they made their complaints up the chain of command and gave their reports to the State Auditor, we need not examine whether their speech passes the remainder of the test established by Pickering and its progeny. . . . As the Seventh Circuit explained, 'Garcetti requires that before analyzing whether an employee's speech is of public concern, a court must determine whether the employee was speaking 'as a citizen' or, by contrast, pursuant to his duties as a public employee.'") (quoting Sigsworth v. City of Aurora, 487 F.3d 506, 509-10 (7th Cir. 2007) and citing in support Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192, 1202-03 (10th Cir. 2007)). Consequently, plaintiff's First Amendment retaliation claim cannot proceed to a jury.

For the reasons set forth above, defendants' motion for summary judgment will be granted. An appropriate order will follow.

Date: March 16, 2011

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Samuel J. Pasquarelli, Esquire

        Mary Lynch Friedline, Esquire

        Via: CM/ECF Electronic Filing